# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID RAYMOND ANDREWS, | CV F   04-5957 REC DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATIONS |
| | REGARDING PETITION FOR WRIT OF |
| v. | HABEAS CORPUS |
| | [Doc. 1] |
| STUART J. RYAN, | |
| Respondent. | |
| _____/ | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY[1]

On July 26, 2002, following jury trial in the Madera County Superior Court, Petitioner was convicted of second degree murder (Cal. Pen. Code § 187.).  (Respondent's Exhibit A, attached to Answer.)  On August 23, 2002, Petitioner was sentenced to 15 years to life, with the possibility of parole.  (Id.)

Petitioner filed a timely notice of appeal to the California Court of Appeal, Fifth Appellate District.  On March 3, 2004, the Court of Appeal affirmed the conviction. (Respondent's Exhibit B.)  On March 19, 2004, Petitioner filed a petition for rehearing. (Respondent's Exhibit C.)  On March 29, 2004, the Court of Appeal denied the petition for rehearing.  (Respondent's Exhibit D.)  On April 14, 2004, Petitioner filed a petition for review in

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer.

1    the California Supreme Court. (Respondent's Exhibit E.) On May 24, 2004, the California

2    Supreme Court denied the petition for review. (Respondent's Exhibit F.)

3         Petitioner filed the instant petition for writ of habeas corpus on July 12, 2004.

4    Respondent filed its answer on October 22, 2004, and Petitioner filed a traverse on November 8,

5    2004.

6                                          DISCUSSION

7    A.    Jurisdiction

8         Relief by way of a petition for writ of habeas corpus extends to a person in custody

9    pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

10   or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

11   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered

12   violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises

13   out of the Madera County Superior Court, which is located within the jurisdiction of this Court.

14   28 U.S.C. § 2254(a); 2241(d).

15        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

16   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

17   enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S.

18   1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting

19   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

20   1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

21   (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant

22   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

23   B.    Standard of Review

24        This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

25   custody pursuant to the judgment of a State court only on the ground that he is in custody in

26   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

27        The AEDPA altered the standard of review that a federal habeas court must apply with

28   respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

                                               2

1   Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus

2   will not be granted unless the adjudication of the claim "resulted in a decision that was contrary

3   to, or involved an unreasonable application of, clearly established Federal law, as determined by

4   the Supreme Court of the United States;" or "resulted in a decision that was based on an

5   unreasonable determination of the facts in light of the evidence presented in the State Court

6   proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of

7   the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v.

8   Taylor, 120 S.Ct. 1495, 1523 (2000).  "A federal habeas court may not issue the writ simply

9   because that court concludes in its independent judgment that the relevant state-court decision

10  applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations

11  omitted).  "Rather, that application must be objectively unreasonable." Id. (citations omitted).

12       While habeas corpus relief is an important instrument to assure that individuals are

13  constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392

14  (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a

15  criminal conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

16  Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's

17  factual determinations must be presumed correct, and the federal court must accept all factual

18  findings made by the state court unless the petitioner can rebut "the presumption of correctness

19  by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115

20  S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day,

21  110 F.3d 1380, 1388 (9th Cir. 1997).

22  C.    Insufficient Evidence/Denial of Motion for Acquittal

23       Petitioner contends that the trial court erred in denying his motion for acquittal and that

24  there was insufficient evidence to support his conviction of second degree murder.

25       The law on insufficiency of the evidence claim is clearly established.  The United States

26  Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a

27  federal court must determine whether, viewing the evidence and the inferences to be drawn from

28  it in the light most favorable to the prosecution, any rational trier of fact could find the essential

3

elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).

Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

Initially, to the extent Petitioner is attempting to allege a federal constitutional violation

in that the trial court denied his motion for acquittal, it fails to state a federal claim.  There is no

basis in federal constitutional law as laid down by the United States Supreme Court, the

applicable criterion in a federal habeas corpus proceeding, Schaff v. Snyder, 190 F.3d 513, 533

(9th Cir. 1999) for the proposition that due process is violated by the denial of a motion to acquit

in the middle of the case.  Hernandez v. Cowan, 200 F.3d 995, 998 (7th Cir. 2000).  However,

Petitioner's claim is, in effect, an attack on the sufficiency of the evidence, which is cognizable

in federal habeas corpus review.

In the instant case, Petitioner was charged with murder in violation of California Penal

Code section 187 which states:

> Every person who unlawfully kills a [human being] [with malice
> aforethought], is guilty of the crime of murder in violation of section 187 of the
> Penal Code. . . .
> In order to prove the crime, each of the following elements must be
> proved:
>     1.  A human being was killed;
>     2.  The killing was unlawful; and
>     3.  The killing [was done with malice aforethought].

(CT 137.)

After the prosecution presented its evidence, Petitioner moved to dismiss count one

pursuant to California Penal Code section 1118.1.[2]  (CT 96.)

As detailed by the Court of Appeal, the evidence at trial established the following:

On January 8, 1999, Franklin Harper Jr., the step-father of the mother of Petitioner's

unborn child, and Petitioner were in the home of Harper's wife.  (RT 130-132.)  Harper in a loud

voice told Petitioner, "You need to leave." (RT 132.)  Harper's wife drove Harper to Chestnut

---

[2]  Section 1118.1 provides:
    In a case tried before a jury, the court on motion of the defendant . . . at the close of the
evidence on either side and before the case is submitted to the jury for decision shall order the
entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading
if the evidence then before the court is insufficient to sustain a conviction of such offense . . . on
appeal.

1    Street in Fresno and dropped him off.  (RT 133.)

2       Petitioner told Denise Mayberry, the mother of his unborn child, that Harper had been

3 disrespectful to him.  (RT 194-195.)  Around 6:00 p.m. on January 8, 1999, Petitioner told Alex

4 Stovall that Harper had disrespected him.  (RT 516-517.)  Petitioner had said that Harper should

5 not have said that to him and that Harper did not know with whom he was messing.  (RT 517.)

6 Petitioner had told Stovall that he did not want Harper pushing his buttons.  (RT 520.)  Sometime

7 after 10:00 p.m., Petitioner and Harper talked on the telephone.  (RT 190-191.)

8       Around 2:00 a.m. on January 9 , 1999, Harper spoke with his wife on the telephone.  (RT

9 138, 167.)  The telephone on Harper's end was dropped or put down, but not hung up.  (RT 147,

10 170.)  This was the last time Harper's wife heard from him.  (RT 148.)  Harper was last seen by

11 his daughter, Erica, in her apartment in the early morning hours of January 9, 1999, and it did not

12 appear that Harper slept there when Erica awoke at 6:00 a.m. (RT 245.)

13       Petitioner and Denise left the residence after 2:00 a.m. on January 9, 1999.  (RT 145,

14 199.)  Petitioner and Denise went to the Timbers Apartments off Butler and Chestnut.  (RT 196.)

15 While Denise waited in the car, Petitioner got out and then came back.  (RT 196.)  Petitioner then

16 dropped Denise off on Motel Drive in Fresno and left in his car, a newer model white Cougar.

17 (RT 197.)

18       On January 9, 1999, at 7:24 a.m., Madera County Sheriff's Deputy Kathy Starr located a

19 burning vehicle at the intersection of Road 602 and Road 28 and a half.  (RT 277.)  The vehicle

20 appeared to have collided with a power pole and was on fire.  (RT 277.)  The vehicle was about

21 three-quarters consumed by fire.  (RT 278.)  A .38 caliber Smith and Wesson revolver was lying

22 in the roadway 25 feet south of the burning vehicle.  (RT 278-280.)  There were foot tracks on

23 the driver's side of the vehicle.  (RT 282.)  South of the vehicle was a gun-type box that had

24 contained a .44 caliber Smith and Wesson revolver.  (RT 282-283, 285.)  Further south of the

25 blue box were 14 unused .38 caliber bullets scattered in an ice plant.  (RT 283.)  Two spent

26 bullets were found at the rear of the vehicle.  (RT 285.)

27       Harper's blood was found on the recovered Smith and Wesson and gun case.  (RT 389-

28 392, 401.)

The car, which was owned by Petitioner, did not appear to have been stolen.   (RT 287-288.)   The contents of the glove box had not been scattered as is typically done in a stolen vehicle.   (RT 287.)   The windows were broken out from the fire and not from a forced entry from the outside.   (RT 287.)   The steering column and stereo were intact.   (RT 287.)   In that type of vehicle it would have been common for a car thief to break into the steering column to access the ignition and stereos are commonly taken from stolen vehicles.   (RT 287-288.)

Petitioner's brother lived six miles north of where the car was located.   (RT 289.)

On January 9, 1999, Denise next saw Petitioner walking on Motel Drive carrying a briefcase.   (RT 198-199.)   Denise had seen Petitioner with two handguns and was aware that he sometimes kept them in the briefcase.   (RT 211-212, 215, 233-234, 237.)   Petitioner told Denise that his car had been stolen.   (RT 199.)   Petitioner appeared to be irritated or angry when Denise asked him if he was going to report the car stolen.   (RT 201.)   Denise and Petitioner then went to Denise's mother's house and Petitioner appeared to make a telephone call to the police to report that his car had been stolen.   (RT 203-204.)   The Fresno Police Department or California Highway Patrol had no record of any stolen vehicle report by Petitioner concerning his Cougar on January 9, 1999.   (RT 463, 465-467.)

Despite the fact that Petitioner had been excited about the upcoming birth of his first child, Petitioner left Denise and never made contact with her again.   (RT 187-188, 207-208.)

On March 9, 2000, Harper's skeleton was found in a cow pasture about one and a half to two miles from the location of Petitioner's burning vehicle.   (RT 323, 324, 499.)   The body had not decomposed in the place where it was found.   (RT 331-332.)

Petitioner was subsequently arrested at a border crossing in El Paso, Texas.   (RT 375-376.)

After the presentation of the prosecution's case-in-chief, Petitioner moved for a judgment of acquittal, and the prosecutor argued as follows:

> What we have most importantly is we have a vehicle that is found on the same - in the early morning hours of the same day that the defendant - or the victim is missing.
> At the scene we have a gun and gun case, which has [sic] the victim's blood on two areas.  We have a vehicle found in an area - remote area of Madera

County, Road 28 and a half and Road 602, which is down the road from where the body was eventually found.

It's the People's position that the person dumping the body would retreat down back to Fresno following Road 602, missed that turn, which there has been ample evidence regarding that angle. That turn was missed. The pole was struck after dumping that body.

When that was done the items of evidence located there were then attempted to be scattered or hidden. That's why we have the gun box down the road in the bushes, but the gun, it was found in the middle of the road. A black gun and a black road. In the middle of the road with no light.

We have testimony that the defendant claims that the vehicle was stolen. We heard testimony there is no evidence of ever being stolen. No report of - with any agency in the Fresno area.

And then the [Petitioner], well, we heard the [Petitioner] leave the area apparently.

(RT 533-534.)

The trial court denied the motion for judgment of acquittal. (RT 537.)

Petitioner contends that the prosecutor produced no evidence establishing that the deceased was murdered. In response to this argument, the Court of Appeal stated,

> As for the evidence that [the victim] was murdered, the jury could reasonably infer that someone who has died a natural death, and who has a wife, a mother, and an adult daughter who live nearby, would not be likely to have his body left in a grazing field. [The victim] was at his daughter's apartment in Fresno at 2:00 a.m. on January 9 when he was having his telephone conversation with Patsy Mayberry. At that time, he was in good health. His mother filed a missing persons report with the police department several days after his disappearance. The prosecution's theory was that [Petitioner] killed Harper sometime after 2:00 a.m. on January 9, dumped the body in the grazing field, and then crashed his car into the power pole while speeding away after dumping [the victim's] body in the field. The jury saw pictures of the burned car, with front-end damage, resting against the power pole. It is true that the People could not demonstrate a precise physical cause of Harper's death, but this was because [the victim's] skeletal remains were not found until more than a year later. Dr. Stephen Avalos, a surgical pathologist, testified that a person can die from a gunshot wound or a stab wound and that skeletal remains can show no evidence of these wounds. He further testified that "[y]ou may get fortunate and find the bullet hole in the skull or evidence of bullet holes inside of the bones" and "[i]t's uncommon, but you may see knife marks on ribs or maybe knife marks on other bones if the person was stabbed." The only observable damage to [the victim's] skeletal remains was some damage to his two front teeth. A defense expert, Dr. Roger Lajeunesse, testified that Harper's "central incisors had been broken on the medial edges." He further described this damage as "between the two front teeth . . . there were angles, cracks, fractures . . ." Franklin Harper's mother testified, as a prosecution rebuttal witness, that Franklin Harper had no damage to his two front teeth when she last saw him alive on January 6, 1999, three days before his disappearance.

(Respondent's Exhibit B, at 13-14.)

Although there was no gun shot wound or other established cause of death, expert

7

1  evidence established that a person can die from a gunshot wound or stab wound and the skeletal

2  remains can show no evidence of these wounds.  (RT 479-480.)   As Respondent submits, there

3  was sufficient evidence that Petitioner, armed with a gun, sought out the victim, murdered him

4  and attempted to conceal the crime.   There was testimony by two witnesses that Petitioner

5  frequently carried a gun, there was evidence that Petitioner felt he had been disrespected by the

6  victim, Petitioner was at the victim's daughter apartment building on the night in question, and

7  the victim was looking for a ride.  Further, there was testimony that on the morning of January 9,

8  1999, Petitioner did not have his car, became agitated when asked if he was going to report it

9  stolen, and in fact did not report it stolen, and was never seen after the incident.

10       In his traverse, Petitioner contends that the Court of Appeal unreasonably inferred that

11  Petitioner and Denise Mayberry could have picked the victim up at his daughter's apartment on

12  the night of the killing (January 9, 1999.)  Petitioner merely contends that there was no evidence

13  that Petitioner picked the victim up at his daughter's apartment.  To the contrary, the evidence

14  admitted at trial reasonably support's the state court's determination.  Although there was no

15  testimony that Petitioner picked up the victim at his daughter's apartment on the night in

16  question, the evidence does establish that the victim was looking for a ride from his wife, who

17  refused, the victim's daughter testified that it did not appear that her father stayed the night at her

18  apartment, and Petitioner was present at Harper's daughter's apartment in the early morning

19  hours on January 9th.  These facts support a reasonable inference as found by the Court of Appeal

20  that the jury may well have believed that when Denise and Petitioner drove to the Timbers

21  apartments shortly after 2:00 a.m. on January 9, they picked up the victim from his daughter's

22  apartment at that time.  (Exhibit B, at 10.)

23       Further, as stated by the Court of Appeal, Petitioner's argument is best refuted by a

24  portion of the prosecution's closing argument,

25            Just remember the [Petitioner's] story.  Look how his story, oh, my car
            was borrowed and it just happens to be borrowed and it just happens to be driven
26            to Madera and just happens to crash into a pole, just happens to have a gun in
            there, it just happens to have the gun has blood of the victim on it and it just
27            happens to be down the road from where the body was found and it just happens
            to be up the road from where the [Petitioner's] mother [sic] lives.
28            Think about that.  That's a lot of little coincidences to happen the way he

8

1    says it happens.

2    (Exhibit B, at 12-13.)

3        The state courts' determination of this issue was not contrary to, or an unreasonable

4    application of, clearly established Supreme Court precedent.  Nor was it an unreasonable

5    determination of the facts in light of the evidence presented at trial.

6                                         RECOMMENDATION

7        Based on the foregoing, it is HEREBY RECOMMENDED that:

8        1.        The petition for writ of habeas corpus be DENIED; and

9        2.        The Clerk of Court be directed to enter judgment in favor of Respondent.

10        These Findings and Recommendations are submitted to the assigned United States

11    District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-

12    304 of the Local Rules of Practice for the United States District Court, Eastern District of

13    California.  Within thirty (30) days after being served with a copy, any party may file written

14    objections with the court and serve a copy on all parties.  Such a document should be captioned

15    "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections

16    shall be served and filed within ten (10) court days (plus three days if served by mail) after

17    service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to

18    28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the

19    specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

20    F.2d 1153 (9th Cir. 1991).

21        IT IS SO ORDERED.

22    **Dated:    August 15, 2005**                    **/s/ Dennis L. Beck**
      3b142a                                        UNITED STATES MAGISTRATE JUDGE

23

24

25

26

27

28

9